**Erv STRONG & Sonja Strong d/b/a "The Dolphin Connection"**

v.

**The UNITED STATES of America and Robert A. Mosbacher, Secretary, Department of Commerce.**

### Civ. A. No. C–91–083.

United States District Court,
S.D. Texas,
Corpus Christi Division.

Sept. 30, 1992.

*Amended Final Judgement Oct. 2, 1992, as amended Oct. 29, 1992.*

---

Les Cassidy, Woolsey & Cassidy, Corpus Christi, TX, for plaintiff.

Larry Ludka, Asst. U.S. Atty., Corpus Christi, TX, for defendant.

## ORDER GRANTING SUMMARY JUDGMENT FOR PLAINTIFFS

HEAD, District Judge.

Erv and Sonja Strong operate motor launch cruises on the waters of Corpus Christi Bay. During these cruises, the Strongs and their customers observe and feed the members of two pods of Atlantic bottlenosed dolphins (*Tursiops truncatus*) that are seasonal residents of the bay. The dolphins voluntarily approach the boat upon hearing its outboard engine reduce speed. The Strongs and their customers give the dolphins fresh fish set aside for the Strongs by local bay shrimpers during the culling of bycatch from trawling operations.

On March 20, 1991, in reliance on the Marine Mammal Protection Act, ("MMPA"), 16 U.S.C. § 1361 *et seq.*, the Department of Commerce's National Marine Fisheries Service ("NMFS") issued a regulation prohibiting .feeding operations

like the Strongs'. 50 C.F.R. § 216.3. The regulation construed a prohibited "taking" under the MMPA, 16 U.S.C. § 1362(12), to include feeding a marine mammal in the wild. 50 C.F.R. § 216.3.

The Strongs sought protection from enforcement and judicial review of the regulation under 5 U.S.C. § 706(2) (Administrative Procedure Act or "APA"). The Strongs presently operate their tours under this Court's orders preventing NMFS from enforcing the regulation against them. Cross motions for summary judgment have been filed and argument heard on the motions. The Court now enters this order, granting plaintiffs' motion for summary judgment, denying the government's motion for summary judgment, and permanently enjoining enforcement of the regulation as it relates to dolphins.

The Strongs challenge the prohibition on dolphin feeding on three grounds: (1) the regulation exceeds the grant of statutory authority to prohibit takings; (2) on the record developed, the agency's decision to prohibit feeding is arbitrary and capricious; and (3) even if the interpretation of the statute is proper, NMFS's categorical refusal to consider public display requests for feeding operations is arbitrary and capricious and an abuse of discretion.[1]

The government defends by arguing that Congress delegated broad rule-making authority to the Secretary of Commerce in the MMPA. That authority includes the power to define a "taking" in this way. In addition, the government argues that not only is their decision to prohibit feeding based on the best scientific evidence available, but it is consistent with the agency's long-standing practice of construing the term "harassment" to include actions that alter or disrupt normal behavior patterns of marine mammals.

*Discussion*

I.

■ The Supreme Court set forth the appropriate standard for judicial review of the NMFS regulation in *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Judicial review of an agency's interpretation of a statute it enforces is a two-step process. The Court first must determine whether Congress has spoken directly to the precise question of construction at issue. *Id.* at 842–43, 104 S.Ct. at 2781–82. If Congress's intent as to meaning is clear, the Court must end its review there. If, however, the Court finds Congress's intent to be unclear or ambiguous, the Court must determine "whether the agency's answer [to the interpretation question] is based on a permissible construction of the statute." *Id.* The agency's interpretation is controlling unless it is "arbitrary, capricious or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

■ This Court finds that Congress has spoken well enough to the meaning of "harass." Congress's intent as to construction is sufficiently unambiguous, leaving no policy choice to the agency to include a definition of taking to mean feeding. The agency, and this Court, must give effect to Congress's intended meaning of "harass," rather than the agency's strained, unnatural construction.

Any ambiguity in Congress's meaning may be resolved through an examination of the language of the statute itself. The government argues that there is no accepted, common usage of the word "harass." The plaintiff responds: "The term 'harass' is commonly understood to mean 'to irritate or torment persistently.' *See The American Heritage Dictionary, Second College Edition* 593 (1982). *See also, Webster's New Collegiate Dictionary* 379 (1970). ('to annoy continually')." *Plaintiff's Memorandum of Law Opposing Defendant's Motion for Summary Judgment* at 6. This Court agrees with the plaintiff. "It thus seems clear that the term 'harass'

1. The MMPA provides for exemptions from the moratorium on taking for those persons who hold permits for either scientific research or public display. The NMFS policy of refusing to consider applications for public display permits filed by feeding tour operators forced the Strongs to apply for a permit to study the dolphins.

would not in its ordinary sense include the mere feeding of animals in the wild, and it is highly unlikely that Congress intended it to have such a meaning." *Id.* at 6–7.

In addition, when one reads the word "harass" in the context of the string of words in which Congress uses it, Congress's intended meaning becomes even clearer. *See* 16 U.S.C. § 1362(12). "The term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* It becomes clear that Congress intended a taking to be a reduction to possession or an annoyance sufficiently disturbing to cause flight from concern for self-preservation.[2]

### II.

Even if the Court is incorrect in finding Congress's intended meaning to be unambiguous, this Court finds the Secretary's construction to be "arbitrary, capricious or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. The statute contains no indication that Congress intended to prohibit this type of human behavior,[3] nor is there any indication that Congress intended a blanket restriction on interaction between marine mammals and humans. In fact, Congress authorized an exemption from the moratorium on taking for display permits. 16 U.S.C. § 1374(c).

■ The government is correct in asserting the Secretary's broad rule-making power under the MMPA. *Balelo v. Baldridge*, 724 F.2d 753 (9th Cir.1984), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). That power must be exercised within the scope of the statute. It does not permit writing into the statute a control over recreational behavior that the statute gives not the slightest hint of intending to control. The Secretary's definition of "harass" to include feeding is so strained that

it is not only diametrically opposed to the remainder of the language of the statute but also to ordinary statutory interpretation.

In addition, the record does not contain an adequate amount of the best scientific evidence available, which is required by the statute to be the basis for such a regulation. *See* 16 U.S.C. § 1373(a). The record contains no conclusions of scientific studies as to the effect of humans feeding dolphins. In fact, the government readily admits that no such studies exist. The experts who have offered their opinions do so without the submission of any of their studies into the record. They offer no concrete support for their speculations.

Rather than use of precise scientific evidence, the NMFS chose to support its regulation with theories of possible harm to dolphins based on evidence that is merely anecdotal. For example, there can be no logical support by the agency for a feeding ban by using evidence that a shrimper shot a dolphin for interfering with his shrimp boat. This judge heard that case and sentenced the defendant. If the agency wants to present a more complete picture of dolphins and shrimp boats than presented, the Court refers the agency to the *entire* record of *U.S. v. Mosier.* On another issue, reference is made to the concern for human safety, which clearly goes beyond the purpose of the statute.

### III.

■ Finally, even if the Secretary's construction of a "taking" is correct, the Court finds that the agency has abused its discretion and has acted arbitrarily in denying plaintiffs' permit. Plaintiffs' permit was denied because NMFS has a policy—not a regulation—against the issuance of public display permits for feeding operations, *i.e.*, in a natural setting. NMFS's "policy" that

---

**2.** This intent becomes even clearer upon an examination of Congress's statement of policy supporting its enactment of the MMPA: the recognition of a possibility of depletion or extinction and the prevention of that possibility occurring.

**3.** There is evidence that Congress was concerned about less benign behavior that *did* pres-

ent clear dangers to the well-being of the dolphins. Plaintiffs cite such examples of "harassment" from the legislative history as "excessive and wanton" use of herbicides and pesticides and the operation of high speed powerboats in the waters where marine mammals abide. *See* Plaintiff's Memorandum in Opposition at 8.

refuses to consider all public display permit applications for feeding operations in the natural setting is in fact an agency rule that has not been lawfully promulgated.

At issue here is defendant's policy that was published in the Federal Register as a response to the denial of an earlier public display permit application. *See* Policy Regarding Applications for Permits to Approach, Harass and Feed Atlantic Bottlenose Dolphins (Tursiops truncatus) for Public Display, 56 Fed.Reg. 20,341 (1990) at AP 20 in the record. This policy announced that all applications requesting a public display permit for feeding operations would not be accepted for review, and would be returned. There was no announcement of any period of notice and comment, nor is there any evidence that such a period was ever held. The agency developed no administrative record, yet the agency used the policy to deny the Strongs' permit application. *See* S 8 in the record.

█ In order to adopt a rule, an agency must engage in the process of notice and comment, thus giving the public an opportunity to participate in and challenge the agency decision. 5 U.S.C. § 553. The agency, however, is not required to engage in such rulemaking procedures if it promulgates a general statement of policy. § 553(b)(A). " '[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact.' " *Brown Exp., Inc. v. U.S.*, 607 F.2d 695, 700 (5th Cir.1979), *quoting Lewis–Mota v. Secretary of Labor,* 469 F.2d 478, 481 (2d Cir.1972). "A general statement of policy is a statement by an administrative agency announcing motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a *substantive* question of regulation." *Id.* at 701. The substantive question at issue is whether public display permits for dolphins in a natural setting will be permitted.

This Court finds that NMFS's statement is not the announcement of "motivating factors" or "tentative goals" that would make it a general statement of policy.

Rather, it makes a final determination that the "potential adverse impacts [of the proposed feeding operations] ... outweigh the potential benefit of the proposed activities." The agency developed no record on which to base that determination, nor can that determination be tested. The agency thus cuts off the ability of an entire class of persons to apply for the permits rather than giving them some guidance of the circumstances under which they will be granted or considered. The NMFS's "policy statement" thus rises to the level of a rule without the attendant rulemaking procedures required by the APA. The rule is invalid and unenforceable.

█ Further, the policy is indeed worthy of challenge as a rule. Because Congress has recognized the value of public display by providing for permits, the agency has a duty to explore all reasonable avenues of display. The agency already allows the capture of dolphins so they can be entombed in marine parks and taught to perform. The agency obviously authorizes such practice because of perceived educational, commercial and recreational values. The educational and recreational value of feeding operations in the dolphins' natural setting is at least presumptively as good as for marine parks; nonetheless, the agency has declined to expose its own "policy" to proper rulemaking procedures in which the scientific basis of its policy can be challenged by plaintiffs, and the viability of marine mammal protection procedures examined. Proper areas of examination could include issues such as timing, dates and frequency of feeding, dietary and handling protection, and educational programs.

For the foregoing reasons, plaintiffs' request for relief is granted.

## AMENDED FINAL JUDGMENT

### As amended, October 29, 1992.

The earlier Judgment of this Court, dated September 30, 1992, is withdrawn, and the Court substitutes the following as an amended Judgment: Final summary judgment is entered in favor of plaintiffs, with

their costs. The Court permanently enjoins the Secretary of Commerce from enforcing the regulation at issue, 50 C.F.R. § 216.3, as it relates to dolphins. In addition, the Court permanently enjoins the Secretary of Commerce from enforcing the policy statement published at 56 Fed.Reg. 20,341 (1990), as it relates to Atlantic Bottlenose Dolphins.

ORDERED this 2nd day of Oct., 1992.